**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**SARALA NIRMANEE WIJERATHNE DISSANAYAKE MUDIYANSELAGE, *et al.*,**

:

**Plaintiffs,**

**v.**

**JOSEPH EDLOW, *et al.*,**

:

**Defendants.**

**Case No. 2:26-cv-895**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge S. Courter M. Shimeall**

## OPINION AND ORDER

Spouses Sarala Nirmanee Wijerathne Dissanayake Mudiyanselage and Vidura Midelle Pathirajage are Sri Lankan nationals living in Blacklick, Ohio. They have lawfully resided in the United States with their son since 2023 pursuant to temporary nonimmigrant visas. Hoping to continue their life in their chosen country and provide stability for their family, they explored options to remain permanently in the United States.

That hope appeared to become reality when Ms. Dissanayake Mudiyanselage won the immigration lottery. In May 2025, she was randomly selected from over 20 million applicants for further processing in the Diversity Immigrant Visa Program ("DV Program") for fiscal year 2026 ("DV-2026"). Following her DV-2026 lottery selection, she promptly applied for an adjustment of status to permanent resident

on behalf of herself and her husband (who is a derivative beneficiary of her DV-2026 selection).

Less than two months after Plaintiffs filed their applications, the Secretary of the Department of Homeland Security ("DHS") directed the United States Citizenship Immigration Services ("USCIS") to pause adjudication of all pending DV applications. This pause is problematic for Plaintiffs because Ms. Dissanayake Mudiyanselage's DV-2026 eligibility ends, by operation of statute, on September 30, 2026, effectively foreclosing the couple's ability to seek permanent residence through that program after that date.

Plaintiffs sued USCIS Director Joseph Edlow, DHS Secretary Markwayne Mullin, Acting Attorney General Todd Blanche,[1] and USCIS Columbus Field Office Director Jesselee Santos-Krider under the Administrative Procedure Act and Mandamus Act. They also moved for a preliminary injunction, asking the Court to (1) enjoin Defendants from refusing to process their pending status-adjustment applications; and (2) order Defendants to adjudicate their DV applications before the September 30 deadline. (Mot., ECF No. 2.)

On August 4, pursuant to S.D. Ohio Civ. R. 65.1(a), the Court held an informal conference on Plaintiffs' Motion for Preliminary Injunction. At that conference, the parties agreed that neither fact-finding nor a hearing was necessary

[1] After Plaintiffs filed their Complaint, Defendant Attorney General Blanche was confirmed by the United States Senate and is no longer the Acting Attorney General.

for the Court to rule on Plaintiffs' request for injunctive relief. The Motion is now fully briefed[2] and, for the reasons below, the Motion for Preliminary Injunction (ECF No. 2) is **GRANTED**.

## I. LEGAL FRAMEWORK

Under the Immigration and Nationality Act ("INA"), Congress created the DV Program to provide an annual allotment of "diversity visas" for individuals "from countries with low rates of immigration to the United States." *Goodluck v. Biden*, 104 F.4th 920, 921 (D.C. Cir. 2024). Known colloquially as the "green card lottery," each year the DV Program sets aside up to 55,000 permanent-residency visas for nationals from eligible countries. *See* 8 U.S.C. §§ 1151(e), 1153(c)(1). DVs are allocated among six geographic regions, and no country can receive more than seven percent of the available DVs per year. (*See* Dep't of State, Visa Bulletin No. 7, Volume XI, ECF No. 1-14, PAGEID # 60.)

The process of obtaining a DV involves several steps and a lot of luck. Each fiscal year, millions of foreign nationals enter the DV Program lottery by filing a petition with the State Department. The State Department divides the petitions by region and randomly assigns each petition a rank-order. *See* 22 C.F.R. § 42.33(c). From the pool of rank-ordered petitions, the State Department selects the number of petitions it estimates will result in the issuance of all authorized DVs for that

---

[2] Plaintiffs filed their reply brief after the deadline and then moved for leave to untimely file it. (ECF No. 13.) That Motion for Leave (ECF No. 13) is **GRANTED**.

fiscal year and it notifies the applicants whose numbers fall within the estimated cut-off. [3] *Id*. Provided they meet the DV Program's eligibility requirements, [4] applicants in this narrowed pool are eligible to receive a DV in the fiscal year in which they are selected. 8 U.S.C. § 1153(e)(2).

Lottery selectees are not guaranteed a visa, only the opportunity to apply for one. *Mwasaru v. Napolitano*, 619 F.3d 545, 550 (6th Cir. 2010). An applicant who already resides in the United States may apply for a DV by submitting a Form I-485 Application to Register Permanent Residence or Adjust Status with USCIS. *Id*. (citing 8 C.F.R. § 245.2). To complete the application process, one must demonstrate her eligibility for the DV, pay the applicable filing fee, complete a biometrics appointment, appear for an interview before a USCIS officer, and satisfy all admissibility requirements. *See* 8 C.F.R. §§ 103.2(a)(7), (b)(9), 245.2(a)(2)(i). If an applicant successfully completes these steps and if a DV is "immediately available," the Attorney General may, in his discretion, adjust the applicant's status to permanent resident. *See* 8 U.S.C. § 1255(a).

---

[3] The DV-2026 Program received 20,822,624 entries, from which 129,516 prospective applicants (approximately .06%) were selected to apply for an adjustment of status. *See DV 2026 – Selected Entrants*, Unites States Dep't of State, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/dv-2026-selected-entrants.html.

[4] Applicants are eligible to compete for a DV if they (1) are a native of one of the designated low-admissions countries; and (2) have either (a) a high school education or its equivalent, or (b) have two years of work experience in an occupation requiring at least two years of training or experience. 22 C.F.R. § 42.33(a).

Whether a DV is immediately available and whether the applicant is eligible to receive it depends on the applicant's assigned rank-order and when her application is processed. DVs are issued to eligible selectees in the "random order established by the Secretary of State" for that fiscal year. *See* 8 U.S.C. § 1153(e); 22 C.F.R. § 42.33(c), (e). An applicant may only apply when her rank-order number falls below the cut-off for both her country and region of origin for that month's Visa Bulletin. *See* 8 C.F.R. § 245.1(g). The application must also be processed by midnight on September 30 of the fiscal year of her selection, after which time her eligibility to receive a DV for that fiscal year expires. 8 U.S.C. § 1154(a)(1)(I)(ii)(II); *see also* 22 C.F.R. § 42.33(f) ("Under no circumstances will immigrant visa numbers be allotted after midnight of the last day of the fiscal year for which the petition was submitted and approved.").

## II. FACTUAL BACKGROUND

### A. Executive Action Restricting Immigration

In January 2025, President Trump issued Executive Order ("EO") 14161, titled *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*. 90 Fed. Reg. 8451 (Jan. 30, 2025). Its stated purpose is to ensure that foreign nationals "approved for admission into the United States do not intend to harm Americans or our national interests" and, for those already present in the United States, that they "do not bear hostile attitudes" towards the country or "advocate for, aid, or support designated foreign terrorists" or carry "other threats" to national security. *Id*. The EO called on relevant agencies to, *inter alia*, re-establish the baseline immigration screening and vetting standards

that existed in January 2021 and identify "countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension of the admission of nationals from those countries[.]" *Id.*

Six months later, the President issued a companion proclamation, Proclamation 10949, titled *Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. Proclamation No. 10949, 90 Fed. Reg. 24497 (June 10, 2025). The Proclamation fully suspends the entry of foreign nationals from twelve countries and imposes partial restrictions on nationals from seven others.[5] *Id.* Then, on December 16, the President imposed entry restrictions on 23 additional countries that could not "meet basic criteria for identifying their nationals and residents who pose national security and public safety threats and for sharing information with the United States."[6] Proclamation No. 10998, 90 Fed. Reg. 59717, 59718 (Dec. 19, 2025).

---

[5] The Proclamation fully banned entry for individuals from Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. Partial entry restrictions were placed on individuals from Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. *See* 90 Fed. Reg. 24497, 24499–24501.

[6] Full restrictions were placed on individuals from Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria. Partial restrictions were placed on individuals from Angola, Antigua and Barbuda, Benin, Côte d'Ivoire, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. *See* 90 Fed. Reg. 59717, 59721–59722.

Based on these executive orders, USCIS and DHS implemented several policies directing its personnel to pause final adjudication of certain categories of immigration-benefit applications. *See Doe v. Edlow*, __ F. Supp. 3d __, 2026 WL 1945085, at *7 (S.D. Ohio July 6, 2026) (discussing adjudicatory-hold polices) (Marbley, J.). At issue here is Policy Memorandum PM 602-0193 (the "Policy Memorandum").

**B. Policy Memorandum PM 602-0193**

On December 19, 2025, USCIS issued Policy Memorandum PM 602-0193, titled *Hold and Review of Pending USCIS Adjustment of Status Applications Filed by Aliens Under the Diversity Immigrant Visa Program*. (*See* Policy Memorandum, ECF No. 1-8.) It grounds the Policy Memorandum in EO 14161, situating it as part of the executive's effort to "safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes." (*Id.* at PAGEID # 36.) Informed by these stated concerns, then-DHS Secretary Kristi Noem "directed USCIS to pause its role in the DV Program to safeguard the national security and public safety of the United States and its citizens." (*Id.* at PAGEID # 37.) To that end, the Policy Memorandum directs USCIS personnel to hold final adjudication of all pending immigration-benefits applications under the DV Program, including status-adjustment applications, "pending a comprehensive review." (*Id.* at PAGEID # 35.) It further directs USCIS to undertake a "comprehensive review of all policies, procedures, and screening and vetting processes" and to "prioritize national security and public safety concerns and ensure compliance with applicable laws and

regulations" in adjudicating DV applications. (*Id.* at PAGEID # 35–36.) The Policy Memorandum identifies several metrics and areas for the Agency's individualized review and investigation. (*Id.*) It also requires all applicants to "undergo a thorough review process," including an interview to "fully assess all national security, criminal, and related grounds of inadmissibility and deportation." (*Id.* at PAGEID # 35.)

The DV Program Pause remains "in effect until lifted or modified." (*Id.* at PAGEID # 37.) Otherwise, the USCIS Director or Deputy Director may only lift the hold based on "litigation or other extraordinary circumstances." (*Id.*) As of the date of this Order, the DV Program Pause is still in place.

### C. Procedural History

Ms. Dissanayake Mudiyanselage learned of her selection in the DV-2026 lottery in May 2025. (Compl., ¶ 44.) When her rank-order became current that October, she filed her and her husband's status-adjustment applications. (*Id.*, ¶ 48.) USCIS accepted their applications as filed one month later. (*Id.*)

USCIS did no further processing of their applications by July 2026. With the September 30 fiscal-year deadline looming, Plaintiffs initiated this action, asserting four claims:

- <u>Count I:</u> Agency Action Unlawfully Withheld and Unreasonably Delayed (5 U.S.C. §§ 555(b), 706(1))
- <u>Count II:</u> Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))

- Count III: Agency Action in Excess of Statutory Authority (5 U.S.C. § 706(2)(C))
- Count IV: Writ of Mandamus Act (28 U.S.C. § 1361)

After Plaintiffs filed their Complaint, Defendants invoked the Policy Memorandum's litigation exception, leading USCIS to schedule Plaintiffs' interview and biometrics collection. (*See* Resp., ECF No. 11, PAGEID # 119; ECF No. 11-1; ECF No. 11-2.) Still, Plaintiffs argue that, absent a court order, the DV Program Pause will prevent USCIS from rendering a final decision on their DV applications, effectively ending their ability to seek permanent residency through the DV Program. Plaintiffs ask the Court to enjoin Defendants from applying the DV Program Pause to their pending DV applications and order Defendants to adjudicate those applications before the DV-2026 deadline. (Mot., PAGEID # 91.)

## III. JUDICIAL REVIEW UNDER THE APA

Under 5 U.S.C. § 702, a "person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The APA embodies a "strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). That said, the APA precludes judicial review when (1) there is no final agency action; (2) the relevant statute precludes review; or (3) the action is "committed to agency discretion by law." *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 441–42 (6th Cir. 2022) (citations omitted).

Defendants argue that Plaintiffs' APA claims fail to clear all three barriers to review.

**A. There is a final agency action.**

Under the APA, Courts may only review final agency actions for which there is no other adequate remedy in court. *Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006) (citing 5 U.S.C. § 704). An agency action is final when it: (1) marks the consummation of the agency's decision-making process; and (2) determines a party's rights and obligations or occasions legal consequences. *Id.* at 500–01 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Defendants only dispute whether the Policy Memorandum and corresponding DV Program Pause determine legal consequences for Plaintiffs. (Resp., PAGEID # 125.) According to Defendants, the Policy Memorandum merely "provide[s] guidance on future, case-specific adjudications" and does not "alter any applicant's legal status, determine admissibility, or even compel a particular outcome in any individual case." (*Id.*) Defendants' argument is not well-taken.

For an agency action to cause legal consequences, it must have a "'sufficiently direct and immediate' impact on the aggrieved party[.]" *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 633 (6th Cir. 2016) (citation omitted). Plaintiffs have shown such direct and immediate impact here. Contrary to Defendants' characterization, the Policy Memorandum does not "only provide guidance" for future adjudications; it prevents USCIS from reaching final decisions on all DV applications. Because eligibility to receive a DV ends on September 30 of the year of selection, the direct

consequence of this indefinite hold[7] is that all DV-2026 applications still pending on October 1 will be denied. *See Mwasaru*, 619 F.3d at 550 (DVs automatically revoked after midnight of the final day of relevant fiscal year) (citations omitted). Failing to adjudicate DV applications by the end of the fiscal year has "the same effect as affirmative decisions that applicants are ineligible." *Shahi v. U.S. Dep't of State*, 33 F.4th 927, 928 (7th Cir. 2022). This result is automatic, so it requires no further administrative action for Plaintiffs to lose their DV eligibility. This real and impending legal consequence means that the Policy Memorandum and its DV Program Pause are final agency actions for the purposes of Plaintiffs' APA claims.

**B. There is no statutory bar to review.**

Courts cannot review a final agency action when a statute expressly precludes judicial review. 5 U.S.C. § 701(a)(1). "Whether a statute prevents judicial review turns on Congress's clear and convincing intent." *Barrios Garcia*, 25 F.4th at 442. "When a statute is 'reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Kucana v. Holder*, 558 U.S. 233, 251 (2019) (citation omitted).

Defendants argue that 8 U.S.C. § 1252(a)(2)(B)(ii) prevents the Court from reviewing Plaintiffs' claims. (Resp., PAGEID ## 120–21.)

---

[7] Defendants insist throughout their opposition that the DV Program Pause is only temporary, not indefinite. (Resp., PAGEID ## 127, 134.) Their characterization is at odds with the plain language of the Policy Memorandum, which states that the hold "will remain in effect until lifted or modified[.]" (ECF No. 1-8, PAGEID # 37.) By definition, the DV Program Pause is indefinite.

Section 1252(a)(2)(B) addresses judicial review of "orders of removal" and denials of "discretionary relief" and it states, in relevant part,

> Notwithstanding any other provision of law … no court shall have jurisdiction to review …
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security ….

8 U.S.C. § 1252(a)(2)(B)(ii). The statute divests courts of the ability to review decisions by the Attorney General or DHS when the INA expressly classifies the decision as discretionary.

Here, Defendants rely on 8 U.S.C. § 1255(a), which allows the Attorney General, "in his discretion and under such regulations as he may prescribe," to adjust the status of a foreign national admitted to the United States to that of a lawful permanent resident when certain conditions are met.[8] Defendants argue that this provision granting USCIS the discretion to adjust a DV applicant's status also inherently gives USCIS the discretion to pause adjudication of applications altogether. Thus, Defendants reason, USCIS's discretionary decision to pause adjudication is barred from judicial review under § 1252(a)(2)(B)(ii).

Defendants read § 1255 too broadly. Nothing in that provision grants Defendants with the discretion to withhold all adjudications of status-adjustment

---

[8] Although the text of § 1255(a) vests the discretion to grant or deny status-adjustment applications with the Attorney General, the authority to adjudicate those applications has been statutorily transferred to the Secretary of the Department of Homeland Security and USCIS. *See* 6 U.S.C. §§ 271(b)(5), 557.

applications or to implement policies directing agency officials to stop adjudicating certain categories of applications. *See Doe*, 2026 WL 1945085, at *15 ("Nowhere does [§ 1255(a)] confer complete discretion for USCIS or DHS to enact blanket adjudicatory holds for all foreign nationals from certain countries."); *see also Jin v. Heinauer*, No. 2:07-cv-68, 2007 WL 4287657, at *2 (S.D. Ohio Dec. 4, 2007) (INA grants discretion "as to the grant or denial of applications for adjustment of status," not "over whether or not to act on the application") (Kemp, M.J.) (collecting cases).

Defendants identify no other statute that provides them with the discretion to act as they did here. Section 1252(a)(2)(B)(ii) applies only when a statute expressly accords discretion. And § 1255(a) "does not unambiguously 'specify' for § 1252(a)(2)(B)(ii) purposes" that USCIS "maintains discretion" to pause all adjudications of status-adjustment applications. *See Barrios Garcia*, 25 F.4th at 443 (citation modified). The relevant statutes do not preclude judicial review of Plaintiffs' claims.

### C. The challenged action is not committed to agency discretion by law.

The APA precludes judicial review when the challenged agency action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). To "honor the presumption of review," courts "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co.*, 586 U.S. at 23 (citation omitted).

As discussed *supra* III(B), Defendants have not identified any statute that grants them the discretionary authority to indefinitely pause the adjudication of immigration-benefit applications. Nevertheless, Defendants argue that the relevant statutes provide no judicially manageable standards by which to review the challenged policy and DV Program Pause. This is so, they argue, because there are no guidelines governing the pace at which USCIS must adjudicate status-adjustment applications and no standards to assess how USCIS could complete a "comprehensive review" of Plaintiffs' applications on an "expedited timeline." (Resp., PAGEID ## 123–24.)

Regarding the manner of review, Defendants misunderstand the nature of Plaintiffs' claims. They are not asking the Court to review *how* USCIS vets and reviews their DV applications, a matter entirely committed to the Agency's discretion. *See Hatchet v. Andrade*, 106 F.4th 574, 580–81 (6th Cir. 2024) (factual findings and determinations made during adjudication of immigration-benefits applications are within USCIS's discretionary authority and not subject to judicial review). Rather, Plaintiffs challenge USCIS's indefinite pause on making final decisions on DV applications.

Turning to the pace of adjudication, Defendants miss the legislative forest for its discrete trees. True, there is no statute or regulation that explicitly provides a timeline within which USCIS must adjudicate a status-adjustment application. But several statutes and regulations are instructive as to whether Defendants may

indefinitely hold adjudicating DV applications – read collectively, they provide a manageable standard by which to evaluate the challenged conduct.

To start, 8 U.S.C. § 1571(b) expresses Congress's desire for immigration-benefit applications to be processed "not later than 180 days after the initial filing of the application[.]" *See also Barrios Garcia*, 25 F.4th at 454 ("Congress has expressed that immigration-benefit applications should be adjudicated within six months.") (emphasis and citation omitted). As it relates to the DV Program, the INA provides an "absolute, unyielding deadline by which selectees must receive their visas." *See Gomez v. Trump*, 485 F. Supp. 3d 145, 196 (D.D.C. 2020). The INA likewise expresses Congress's "clear indication of the speed with which it expects" USCIS to process "diversity lottery selectees' visa applications." *See id*. Moreover, the APA itself compels agencies, with "due regard for the convenience and necessity of the parties," to conclude all matters presented to it "within a reasonable time." 5 U.S.C. § 555(b). Considering the "necessity" of a DV applicant receiving a decision before the statutory eligibility deadline, the "reasonable time" to conclude the adjudication of a DV application is before the end of the fiscal year of the applicant's selection.

USCIS's regulations also provide guidance in evaluating the DV Program Pause. An agency can create a nondiscretionary duty "by binding itself through a regulation carrying the force of law." *Barrios Garcia*, 25 F.4th at 450 (citation omitted). Courts have found that USCIS's regulations reflect a nondiscretionary duty to adjudicate pending immigration-benefit applications. *See, e.g.*, *Doe*, 2026 WL 1945085, at *20. For example, USCIS must notify applicants of its decision on

status-adjustment applications. *See* 8 C.F.R. § 245.2(a)(5)(i) ("The applicant shall be notified of the decision of the director and, if the application is denied, the reasons for the denial."). And 8 C.F.R. § 103.2(b)(18) specifies procedural requirements USCIS must follow to ensure it reaches a timely decision when it withholds adjudication of an individual's status-adjustment application to prevent prejudice to its investigation. *See Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1166–67 (N.D. Cal. 2007). USCIS has thus bound itself to process status-adjustment applications and not indefinitely delay their adjudication.

Taking this statutory and regulatory framework as a whole, USCIS cannot simply refrain from adjudicating DV applications, letting them languish until the applicant's eligibility automatically expires. The challenged actions are not committed to agency discretion.

* * *

Finding no bar to reviewing Plaintiffs' APA claims, the Court turns to the merits of Plaintiffs' pending motion.

## IV. PRELIMINARY INJUNCTION

### A. Legal Standard

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602

U.S. 339, 345–46 (2024)). "The purpose of a preliminary injunction, unlike a permanent one, is to prevent any violation of the plaintiff's rights before the district court enters a final judgment." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 372 (2022) (further quotation omitted).

Courts examine four factors when deciding whether to issue a preliminary injunction: (1) whether the plaintiff has established a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury without a preliminary injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the requested injunction. *EOG Res.*, 134 F.4th at 874 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). While courts generally "balance" these four factors, a plaintiff must prove all four to prevail. *Id.* at 885 (citing *Winter*, 555 U.S. at 20).

**B. Likelihood of Success on the Merits**

The first (and most important) preliminary injunction factor analyzes the movant's likelihood of success on the merits of their claims. *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024). A plaintiff need only show a likelihood of success on the merits of at least one claim to warrant injunctive relief. *Union Home Mortg. Corp. v. Ballew*, 814 F. Supp. 3d 884, 905 (N.D. Ohio 2025) (citation omitted). Even so, the Court considers each of Plaintiffs' causes of action and finds that they are likely to succeed on the merits of all three of their APA claims.

### 1. Agency Inaction (Counts I and IV)[9]

Plaintiffs assert two claims relating to their DV applications. First, they argue that USCIS has unlawfully withheld and unreasonably delayed a decision on their applications in violation of the APA (Count I). Second, they ask the Court to compel USCIS to adjudicate their applications under the Mandamus Act, arguing that the Agency has a nondiscretionary duty to adjudicate them (Count IV).

Under the APA, a court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Mandamus Act similarly requires a reviewing court to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Because the relief sought under either statute is "essentially the same," courts generally limit their preliminary-injunction analysis to a plaintiff's entitlement to relief under the APA. *Indep. Min. Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997). The Court follows this approach here and addresses only Plaintiffs' likelihood of success on their APA claim.

#### a) Threshold Issues

Plaintiffs' agency-inaction claim raises two threshold issues. First, to succeed on a claim involving agency inaction, a plaintiff must make an initial showing that

---

[9] Defendants did not address the unlawfully withholding and unreasonably delay claims in response to Plaintiffs' Motion. Notwithstanding this lack of opposition, Plaintiffs must still demonstrate that they are likely to succeed on this claim to obtain injunctive relief.

the agency failed to take a discrete action that it was required to take. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Here, Plaintiffs meet this initial requirement because USCIS has a nondiscretionary duty to adjudicate status-adjustment applications. *See supra* III(C).

Second, Plaintiffs style their claim as both an unlawful-withholding claim and an unreasonable-delay claim but do not distinguish between them even though the two claims are not the same. Whether an agency action has been unlawfully withheld or unreasonably delayed "'turns on whether Congress imposed a date-certain deadline on agency action.'" *Barrios Garcia*, 25 F.4th at 453 (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)). If the agency "has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions," a court "must compel only action that is delayed unreasonably." *Forest Guardians*, 174 F.3d at 1190. "Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts … must compel the agency to act." *Id*.

The Court construes Plaintiffs' § 706(1) claim as an unreasonable-delay claim. As Defendants point out, no statute provides an "absolute deadline" by which USCIS must adjudicate DV applications. Instead, the general timing provisions of the APA, the INA, and USCIS's regulations provide the standard to measure whether USCIS has unreasonably delayed adjudication of Plaintiffs' DV applications.

**b) Unreasonable Delay**

Claims of unreasonable delay are analyzed under the following six-part test outlined in *Telecommunications Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) (the "*TRAC*" factors):

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply the content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Barrios Garcia*, 25 F.4th at 451–52 (citing *id*. at 80).

Applying these factors, Plaintiffs are likely to succeed on their unreasonable-delay claim.

<u>*First and Second Factors*</u>. "The first two *TRAC* factors focus on the extent of and reasons for the agency delay." *Afghan and Iraqi Allies v. Blinken*, 103 F.4th 807, 816 (D.C. Cir. 2024). The second *TRAC* factor – whether Congress has indicated the "speed with which it expects the agency to proceed"– generally "gives

content" to the first factor's "rule of reason." *See id*. Plaintiffs argue that the DV Program's fiscal-year deadline supplies the rule of reason here. The Court agrees.

Under the INA, Congress allocated up to 55,000 DVs per year and created a framework to ensure that the visas are issued each year by limiting DV eligibility to the fiscal year of selection. *See* 8 U.S.C. §§ 1153(e)(2), 1154(a)(1)(I)(ii)(II). Accordingly, the "INA provides a clear indication of the speed with which it expects the agency to proceed in processing diversity lottery selectees' visa applications." *Gomez*, 485 F. Supp. 3d at 196 (citation modified). The rigidity of the INA's fiscal-year eligibility deadline embodies a congressional intent that USCIS "undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline." *See id*. (citation omitted). Given this express (and fleeting) timeline, courts routinely find that "the first two *TRAC* factors favor diversity-visa applicants whose applications are stuck in administrative processing when the statutory deadline is impending." *See Thein v. Trump*, No. 25-2369, 2025 WL 2418402, at *13 (D.D.C. Aug. 21, 2025) (collecting cases).

An indefinite adjudicatory hold is at odds with the expectations set by Congress. Withholding final decisions on these time-sensitive applications frustrates the purpose and design of the DV Program. Thus, Plaintiffs are likely to show that delaying adjudication of their DV applications until they lose their eligibility is unreasonable. These factors favor Plaintiffs.

Third and Fifth Factors. The third and fifth factors, which concern health, welfare, and the interests prejudiced by delay, are often considered together. *See Barrios Garcia*, 25 F.4th at 451. These factors also tip in Plaintiffs' favor.

The DV Program Pause leaves Plaintiffs in "a state of limbo, with their reliance on a previous USCIS process fundamentally undercut." *See Doe*, 2026 WL 1945085, at *22. The uncertainty of whether the once-in-a-lifetime opportunity to gain permanent residency through the DV Program will come to fruition has caused Plaintiffs to experience frequent worry and has upended their family's stability. (*See* Dissanayake Mudiyanselage Decl., ECF No. 1-12, ¶¶ 14–17; Pathirajage Decl., ECF No. 1-13, ¶ 16.)

Fourth Factor. Defendants provide no evidence or argument as to any competing priorities in adjudicating DV applications. To the extent they raise concerns about protecting national security and public safety, they identify no such concerns about Plaintiffs. Indeed, Plaintiffs already reside and work in the United States pursuant to authorization granted by USCIS. Presumably, USCIS already vetted Plaintiffs and found nothing disqualifying for continued residence. And adjudicating Plaintiffs' DV applications does not prevent USCIS from undertaking the case-specific review contemplated by the Policy Memorandum.

Thus, Plaintiffs are likely to show that adjudicating their DV applications does not impede on any higher or competing priorities Defendants may have. This factor favors Plaintiffs.

Sixth Factor. Plaintiffs argue that the first five *TRAC* factors sufficiently weigh in their favor, so the Court need not address whether the DV Program Pause was a result of impropriety. (Mot., PAGEID # 84.) The Court agrees and declines to address this factor.

On balance, Plaintiffs have shown that they are likely to succeed on the merits of their unreasonable-delay claim.

### 2. Arbitrary and Capricious Agency Action (Count II)

Plaintiffs also argue that the Policy Memorandum's DV Program Pause is arbitrary and capricious because it fails to consider an important aspect of the DV Program and the reliance interests that program created, and because it lacks any rational connection to its stated justification.

The APA instructs courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review of such a claim is narrow. *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019). A court may not substitute its judgment for that of the agency. *Id*. Instead, courts "consider whether 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 720 (6th Cir. 2022) (citation omitted). For an agency action to survive judicial review, the agency must

have "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms v. Nat'l Highway Traffic Safety Admin.*, 45 F.3d 999, 1004 (6th Cir. 1995) (citation modified). An agency is "not required to consider all policy alternatives" in reaching a decision, but the court must "ensure that the agency took a 'hard look' at all relevant issues and considered reasonable alternatives." *Id.* (citation modified).

Plaintiffs are likely to show that the DV Program Pause is arbitrary and capricious because USCIS failed to consider its impact on the DV Program's eligibility deadline or DV applicants' reliance interests.

The Policy Memorandum acknowledges that the DV Program Pause "will result in delay to the adjudication of some pending applications[.]" (ECF No. 1-8, PAGEID # 38.) This conclusory acknowledgment ignores that an indefinite hold effectively extinguishes Plaintiffs' eligibility to receive a DV due to the statutory fiscal-year deadline. This omission is conspicuous because the fiscal-year eligibility deadline is a "defining feature" of the DV Program and the gravity of the hold's impact on a person's program eligibility required USCIS to fully consider this "important aspect of the problem." *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 29–30 (2020).

Likewise, Defendants needed to address whether applicants had a legitimate reliance on the continued operation of the DV Program within the statutory deadline. *See id.* at 30. When an agency changes course, such as ending its role in a

statutory program, it "must address how a change will affect those who have relied on" continuation of the prior program. *See Kentucky v. U.S. Env't Prot. Agency*, 123 F.4th 447, 468 (6th Cir. 2024). This requires the agency to "identify these reliance interests and weigh them against the 'policy' reasons supporting the change." *Id.* (citation omitted). Yet the Policy Memorandum contains no consideration of DV applicants' reliance on continued adjudication of their applications or the DV Program Pause's effect on any reliance interest. Ignoring these interests renders the DV Program Pause arbitrary and capricious.

Plaintiffs are also likely to show that the Policy Memorandum fails to rationally and sufficiently connect the DV Program Pause to USCIS's stated national-security interests. USCIS justifies the Policy Memorandum as necessary to "ensure that applicants are vetted and screened to the maximum degree possible." (ECF No. 1-8, PAGEID # 38.) USCIS describes the policy change as rooted in the Executive Branch's concerns regarding the risks some foreign nationals pose to national security and public safety, particularly those stated by President Trump in EO 14161. (*See id.*) To that end, the Policy Memorandum directs USCIS to conduct a "thorough review," on a case-by-case basis, of all DV applications, including investigating several specified concerns. (*See id.* at PAGEID ## 36–37.) If that was all the Policy Memorandum did, the Court would have no difficulty finding that USCIS rationally connected its "thorough review" process to its stated policy goals. But the Policy Memorandum also orders USCIS to stop adjudicating all DV applications until further notice, without explaining how a categorical hold on

adjudication addresses its case-specific security concerns. Nor does it discuss whether the "thorough" review process alone would adequately achieve its stated goal without pausing USCIS's role in the DV Program.

To be sure, an agency is not required to "consider all policy alternatives in reaching its decision." *See Regents*, 591 U.S. at 33 (citation modified). But pausing all adjudication of DVs has no apparent connection to ensuring national security and public safety and the Policy Memorandum includes no explanation of how USCIS determined that an indefinite hold served those interests. Indeed, looking at the practical impact of the DV Program Pause reveals the mismatch to its stated rationale: rather than completing a "thorough review" of Plaintiffs' applications, USCIS took *no action* for nine months. This agency inaction does not protect "national security." As the Court said recently on a similar issue:

> Defendants' position seems to be that because some foreign nationals already admitted into the United States *may be threats to national security or public safety*, USCIS will *delay* adjudication of their pending benefits applications. If that is Defendants' position, it is frankly preposterous. Should the Government's national security concerns be legitimate, it is unclear why adjudications that might address that threat ought to be delayed.

*Doe*, 2026 WL 1945085, at * 27 (emphasis in original and internal citations omitted).

Plaintiffs' case amplifies the arbitrary nature of the DV Program Pause. Defendants have not alleged that Plaintiffs pose any security or safety issues; Plaintiffs already reside in the United States and USCIS recently granted continued immigration benefits to them. (*See* Compl., ¶ 53.) Plaintiffs are Sri Lankan nationals; Sri Lanka is not in any of the executive orders imposing entry

restrictions. *See supra* II(A). How refusing to adjudicate Plaintiffs' DVs protects national security is anybody's guess, but the explanation is not found in the Policy Memorandum.

Plaintiffs are likely to show that the Policy Memorandum's DV Program Pause is arbitrary and capricious.

#### 3. Agency Action in Excess of Statutory Authority (Count III)

Plaintiffs' final claim is that the DV Program Pause exceeds Defendants' statutory authority because it violates USCIS's nondiscretionary duty to adjudicate immigration-benefits applications.

The APA requires courts to set aside agency actions that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

In response, Defendants have not identified any statute providing USCIS the discretion to categorically cease adjudicating DV applications. Instead, they rely on their broad statutory discretion to implement and enforce immigration laws and their discretion over the adjudication process for immigration-benefits applications. But that authority is inapposite here because procedural discretion does not grant Defendants the authority to effectively end a statutory program by "pausing" the administrative process.

Losing the statutory battle, Defendants next argue that, because USCIS's regulations allow the Agency to "withhold adjudication if it determines that an investigation has been undertaken involving the exercise of discretion," it must

have some authority to withhold adjudication. (*Id.* (citing 8 C.F.R. § 103.2(b)(18).) But the regulation on which they rely does not help them because that regulation describes the limited circumstances under which USCIS may temporarily withhold adjudication of an individual application and the procedural requirements it must follow to ensure a timely decision on the withheld adjudication. *See* 8 C.F.R. § 103.2(b)(18). That regulation "is not a blanket authority to indefinitely withhold adjudication of an application for adjustment of status[.] " *Dong v. Chertoff*, 513 F. at 1168.

Thus, Plaintiffs are likely to succeed in showing that the DV Program Pause exceeds Defendants' statutory authority. To reiterate the point echoed throughout this Order, USCIS must adjudicate all immigration-benefits applications and Congress expects those applications to be processed within a finite and reasonable time. The INA sets further expectations regarding the administration of the DV Program and the efforts that should be made to issue all available DVs each year. USCIS's unilateral decision to end a statutory program by policy decree exceeds the authority and limitations that Congress placed on the Agency.

Plaintiffs are likely to succeed on the merits of this claim.

### C. Irreparable Injury

Under the second preliminary injunction factor, courts consider whether the plaintiff "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citation omitted).

Plaintiffs have sufficiently demonstrated that application of the Policy Memorandum's adjudicatory pause will cause them actual and imminent harm. Without a preliminary injunction, Plaintiffs will soon lose their eligibility under the DV Program. (Mot., PAGEID # 88.) Neither USCIS nor the Court can provide relief to DV applicants once their eligibility expires. *Mwasaru*, 619 F.3d at 550–51. And Plaintiffs have sufficiently alleged that continued application of the DV Program Pause has impacted their well-being. (*See* ECF No. 1-12, ¶¶ 14–17; ECF No. 1-13, ¶¶ 15–19.)

**D. Balance of Equities**

The final preliminary-injunction factors relate to the balance of harms and the public interest. When the federal government is the defendant, the third and fourth preliminary-injunction factors merge. *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023).

Here, the harm to Plaintiffs is clear. Without injunctive relief, "there is a strong likelihood" that they "will lose any opportunity for permanent relief later." *Gomez*, 485 F. Supp. 3d at 200.

Conversely, Defendants' harm is not clear. They identify two broad "harms" untethered to the facts in this case. First, they argue that national security is an important government interest. (Resp., PAGEID # 134.) True, but they have not explained how that interest is implicated here. Second, they argue that there is "substantial government harm" when courts "usurp[]" the Executive Branch's authority over immigration laws. (*See id.*) But the Court's limited role here is to review whether Defendants' actions complied with the APA and remedy any

violation to ensure lawful compliance; that cannot be characterized as "usurping" the Executive Branch's authority. And there is a significant "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

Balancing the harms and the public interests, Plaintiffs have shown that these factors weigh in favor of granting a preliminary injunction.

## V. REMEDY

The Court finds that a preliminary injunction is warranted. Plaintiffs' Motion is **GRANTED**.

Defendants are hereby **ORDERED** to process Plaintiffs' DV applications without application of the Policy Memorandum. Defendants are further **ORDERED** to make a good-faith effort to adjudicate Plaintiffs' DV applications before September 30, 2026.

## VI. BOND

Plaintiffs ask the Court to waive bond under Federal Rule of Civil Procedure 65(c). District courts have discretion over whether to require a party to post security in connection with a preliminary injunction. *See Moltan Co. v. Eagle-Pitcher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). The general purpose of requiring a bond is "to ensure that the enjoined party can recover the monetary damages it suffers, if it is wrongfully enjoined." *Bookfriends, Inc. v. Taft*, 223 F. Supp. 2d 932, 953 (S.D. Ohio 2002) (Rice, J.). The Court finds that bond is not necessary here, so the Court **WAIVES** the security requirement under Rule 65(c).

## VII. CONCLUSION

For the reasons stated herein, the Plaintiffs' Motion for Preliminary Injunction (ECF No. 2) and Motion for Leave to File Reply (ECF No. 13) are **GRANTED**.

The Court **SETS** a telephonic status conference on **September 8, 2026, at 3:00 p.m.**, during which Defendants should be prepared to discuss their compliance with the terms of this injunction.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**